# CATHERINE HANRAHAN *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE CITY ET AL.

*Liability of Municipal Corporation and Its Contractor for Negligence in the Construction of a Sewer Trench Injuring Adjoining House—Right to Lateral Support—Evidence—Opinions of Experts—Pleading.*

A count in a declaration against a municipality and its contractor for building a sewer which alleges that the defendant so located and constructed a sewer in the alley adjoining plaintiff's house that the earth supporting the walls of the house and its foundation settled and sank, whereby the house was injured, is bad on demurrer, since the defendants had the right to construct the sewer, and this count does not charge that they did the work improperly or negligently.

Plaintiff's house, which was new and well built, abutted on an alley in which the defendants, a municipal corporation and its contractor, constructed a sewer. The trench for the sewer some eight feet ten inches deep was dug on the side of the alley nearest to plaintiff's house and about six feet from the wall. This trench was allowed to remain open its full length for more than three weeks, during which time there were several severe rainstorms and the water was not pumped out of the trench, but was allowed to stand until it soaked into the ground. After the earth was thrown back into the trench, an inch and a-half water pipe, which crossed the trench three feet below the surface adjoining plaintiff's house, was broken. Such pipes should be supported when the trench is filled, but this pipe was not supported, and it was broken by the weight of the earth thrown on it. Sheet piping or lagging was used in the construction of the trench and was left in it when it was filled. The failure to cut off the lagging

below the surface allowed the water to run down behind it, making a cavity into which one witness, just before the trial, poured several buckets of water, which disappeared. After the construction of the sewer, the walls and ceilings of plaintiff's house began to crack and the cracks began to grow larger, and the rear wall fell out of plumb. *Held,* that this evidence is legally sufficient to show negligence on the part of the defendant in the construction of the sewer, resulting directly in injury to the plaintiff and that consequently it was error to instruct the jury that their verdict must be for the defendants.

A municipal corporation is not liable for any and all damage that may result to a property owner from the construction of a sewer, but it is liable for its negligent or unskillful performance of the work.

When a municipal corporation employs a contractor to build a sewer, under the supervision and control of a municipal official, the city is liable for any negligence of the contractor in the performance of the work.

The right of an owner of land to lateral support may be asserted against a municipality making excavations in the adjoining street.

The duty of the owner of a house to shore or prop his land after notice when excavations are made adjoining it, does not require him to guard against the negligence of the other party in making the excavations.

In an action where the question is whether the defendant was guilty of negligence in the construction of a trench and sewer, expert witnesses cannot be allowed to give their opinion that, from the facts stated in the questions to them, the defendants had not exercised due care. That was a matter for the determination of the jury.

In an action for injury to a house, evidence that certain repairs would put the house in as good a condition as it was before the injury is competent; as is also evidence concerning the effect on the value of the house of putting iron anchors or braces in it.

When a certain document has been admitted in evidence, a party is entitled to read to the jury certain parts of it which he deems material.

In an action to recover damages caused to plaintiff's house by the construction of a trench and sewer alongside of it, a witness may be asked how long the trench remained open and why the sewer was constructed at that particular point.

When the record on appeal is so confused by a colloquy between the trial Court and counsel that this Court cannot determine the point to which an exception relates, it must be held that there was no reversible error in the ruling.

A witness qualified as an expert in digging sewer trenches may be asked what effect the standing of rain water in the trench would have on the lagging, and he may also be asked whether a certain sewer should have been built in sections or opened for its entire length. ·

When the question is whether a sewer was negligently constructed or not, a witness cannot give his opinion that it ought to have been made on the opposite side of the alley, for negligence in the location of the sewer is as much a question for the jury as whether there was negligence in the details of its construction.

When part of the negligence charged against the defendant is that a water pipe crossing a sewer trench was broken, a witness cannot be asked, "Do you know what causes a breakage in a case of that sort." The question is too broad and vague.

Nor can the witness be asked, "Is there any ordinary method commonly adopted to prevent this breakage, which by W.'s testimony was shown not to have been done." The first part of this question is proper, but there is no evidence to support the assumption in the latter part.

In an action charging the negligent construction of a sewer which injured plaintiff's house, a witness may be asked, "What would be the effect of water standing in a trench of eight feet depth upon the lagging, and also upon the foundation of the adjoining house."

A question is improper which assumes without proof that the defendant omitted to do something which ought to have been done.

In an action charging that defendants' negligence caused the injury complained of, the case should be submitted to the jury if the plaintiff's evidence be such that the fact of negligence can be fairly and rationally inferred from it. That evidence need not point unavoidably and unerringly to defendants' negligence.

*Decided January 13th, 1911.*

Appeal from the Baltimore City Court (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, THOMAS, PATTISON and URNER, JJ.

*William P. Lyons,* for the appellant.

*German H. H. Emory* and *R. Howard Bland,* for the appellees.

PEARCE, J., delivered the opinion of the Court.

This action was brought by the appellant, Catherine Hanrahan, as owner of the house and lot No. 116 W. Lafayette avenue, Baltimore, to recover for damages to said house caused by the construction of a sewer by the appellee, the Mayor and City Council of Baltimore, acting in conjunction with the appellees, M. A. Talbott and Company, general contractors for said work under a written contract between them and the Mayor and City Council.

The declaration contains five counts.

The first count merely alleges that the defendants so located, dug and constructed a sewer in Rutler alley adjoining the plaintiff's property, that the earth supporting the walls of said house, and the foundation on which they were built set-

tled and sank and said house was thereby injured without
any negligence on her part directly contributing thereto.
Both defendants demurred to this count, and the demurrer
was sustained with leave to amend, but the plaintiff failed
to amend.  There was no averment in this count of any neg-
ligent act on the part of either defendant, nor of any actual
physical invasion of the plaintiff's property, and in such
case it is well settled in Maryland there can be no recovery
under such a count.  The Mayor and City Council is a mu-
nicipal corporation authorized by the Act of 1904, Ch. 349,
to build the sewer in question, either through its own serv-
ants or agents or through the agency of an independent con-
tractor.

In *Offutt* v. *Montgomery County,* 94 Md. 115, the second
count of the *narr.* alleged that the County Commissioners in
changing the grade of a highway along the front of the
plaintiff's property dug down seven feet beneath the level
of said property, "whereby the lot is now rendered subject
to inevitable caving and falling away."  There was a de-
murrer to this count, and in sustaining the same the Court
said: "It is not charged that the work was improperly or
carelessly done, and inasmuch as the appellees had power to
authorize the railway company to construct its tracks upon
the bed of the street and to change the grade, and that the
land of the appellant was not actually invaded, it follows
that under the allegations of this count of the *narr.,* the ap-
pellant is not entitled to compensation for the injuries al-
leged to have resulted from the change of grade."

And in *De Lauder* v. *Balto. County,* 94 Md. 7, where un-
der the peculiar facts of that case there was held to be an
actual taking of the plaintiff's property, the Court said: "It
is well settled in this State that as against a municipal cor-
poration in the *careful exercise of its right and power* to
grade or improve public streets or roads, and where there is
no taking or actual physical invasion of property, there can

be no cause of action for an unavoidable injury done." Upon all the numerous cases which might be cited there can be no serious question that the demurrer to this count was properly sustained as to the city. The contractors in this case were performing this work under the supervision of the Mayor and City Council, and cannot be held under the allegations of this count to any other standard of liability. If authority were needed for this proposition, it may be found in *Balto. and Pot. R. R.* v. *Reany*, 42 Md. 130, in which JUDGE ALVEY, said: "As against the municipal government, in the careful exercise of its right and power to grade, change and improve the street, there could be no cause of action for any unavoidable injury done; but as against the appellants, *a private corporation in no wise connected with the municipal government* obtaining authority to use the streets in an extraordinary manner for its own private purposes and profit, the case is quite different." This language is so plain as to require no interpretation, and puts the contractors in this case in the precise position of the Mayor and City Council as respects liability to the plaintiff.

The fifth count charges that the Mayor and City Council in contracting with Talbott & Co. for the performance of this work assumed the duty to repair any damage or injury that might be done by the location or construction of said sewer and to protect from injury the plaintiff's property in the vicinity thereof by caving or otherwise, and that the contractors became jointly bound and liable to the same extent; but so located and dug said sewer that plaintiff's property was damaged by the settling of the walls of said house, and that defendants failed to protect the plaintiff's property as they were bound to do, and failed to restore said house to its condition before said injuries were received, or to pay the cost of such restoration, though requested so to do. Both defendants demurred to this count, which seems to have been drawn with reference to certain provisions of the contract

between the Mayor and City Council, but the demurrer was overruled, and the general issue was pleaded to this count by both defendants. No notice was taken in argument, of this demurrer, and we shall therefore not advert to it further.

The second, third and fourth counts all allege negligence on the part of the defendants. The second charges negligence in the location and digging of the sewer trench. The third and fourth charge the same negligence and also charge that defendants negligently failed to use proper shoring or lagging in the construction of said trench, and negligently allowed the same to remain open an unreasonable time during heavy rains and thereby to accumulate water in said trench, undermining the walls of plaintiff's house; and the fourth, in addition to what is recited above, also charged that defendants negligently permitted and caused a water pipe of the Mayor and City Council which was exposed in digging said trench, to burst and flood said trench, and from thence to flow upon and against the plaintiff's wall, causing the same to settle and sink.

Twenty-seven exceptions were taken to rulings on evidence, and the twenty-eighth to the granting of the defendant's prayers offered at the close of the plaintiff's case.

These prayers were as follows:

"First.—The City prays the Court to instruct the jury that there is no evidence in this cause legally sufficient to entitle the plaintiff to recover under the pleadings against the City, and the verdict of the jury must therefore be for the City."

"Second.—The City prays the Court to instruct the jury that there is no evidence in this case legally sufficient to show any negligence on the part of the City, or for which the City is responsible, and therefore the plaintiff is not entitled to recover under the pleadings against the City, and the verdict of the jury must be for the City."

"First Prayer of the Contractors.—The defendant, M. A. Talbott Co., prays the Court to instruct the jury that under the pleadings of this case there is no evidence legally sufficient to entitle the plaintiff to recover, and the verdict of the jury must therefore be for the defendants, M. A. Talbott & Co."

In order that we may deal intelligently with the numerous exceptions relating to the exclusion of evidence we will briefly summarize the testimony which was admitted.

The undisputed evidence is that the plaintiff's house was built in the year 1900 by an experienced builder, for himself, out of the best material and with proper care and skill, and that until the construction of this sewer the walls and every part of the house were sound and in perfect condition. The plaintiff, who was then living in the house, testified that the trench for the sewer was open, altogether according to her recollection about six weeks; that there were many rainstorms during the time it was open, and water collected therein, which was not pumped, but was allowed to stand until it soaked in the ground; that after the trench was filled she heard the sound of water running, but could not tell where it was, and she called one of the men at work on the job, who discovered a broken water pipe of the city in the trench, which had been running for more than a day; that cracks in the walls and ceilings began to appear and have grown larger and more numerous, and the doors could not be locked or closed and she has been put to expense in endeavoring to close the cracks and repair the damage to the doors and to the house generally. Upon her cross-examination and from the testimony of other witnesses, it may be doubtful whether the trench was open so long as six weeks, but none of the testimony makes the time shorter than three weeks. Mr. Knight testified that he could not tell just how long a section he allowed to be open at one time, but could not recall that it was over 75 or 80 feet.

*Frank G. Walsh,* a builder of twenty-one years' experi-
ence, corroborated the plaintiff as to the condition of the house
in 1910, and said the wall at the rear corner was three and
one-half inches out of plumb, and that the foundations of the
house were three and one-half feet below the curb in the
alley.  He testified that he had dug many similar trenches
alongside of buildings, and knew the custom of builders in
digging such trenches.

*John McKnight,* a builder for thirty-five years in Balti-
more City, who knew the house ever since it was built, saw
the trench open in April, 1907, the pipes lying by it, and
said this was the situation for several weeks; that about the
fifth week, according to his recollection. the pipes were in the
trench, and the dirt was thrown loosely in; that the trench
was about eight feet deep, and the soil in the alley was good
hard gravel and sand.  He testified that he had built many
sewers, both large and small, in Baltimore City.

*Frank Ward,* who was foreman of the Water Department
in 1907, and also at the time of the trial, testified that on
May 22nd, 1907, he repaired a broken inch and a half city
supply pipe in this trench adjoining the plaintiff's house;
that the sewer had been filled in fifty feet north from the
broken pipe—up the alley; that water was running from
this pipe in and outside of the trench; that the pipe broke
in half from the weight of the dirt in the sewer trench; it
was in good condition, not bent, but broken in half; he dug
out the dirt three feet down, but could not tell how the pipe
was kept in place; he said such accidents happened occasion-
ally in sewer work, but could not say how often.  The pipe
was solid cast iron and crossed the trench at right angles three
feet below the surface; it was old construction pipe, but the
break would have occurred just the same if the construction
had been new.

*Herbert M. Knight,* division engineer of the Sewerage
Commission, testified that the sewer trench was on the west

side of the alley, two feet and eight and one-half inches from the west curb of the alley, and on plaintiff's side of the alley. That the pavement was not quite four feet wide, and the trench was eight feet ten and one-half inches deep. The contractors were under the supervision of the City, and he was in control of the work under the contract, but he did not know of his own knowledge what was under the bed of the alley on the side opposite the plaintiff's house; he knew from the records made and delivered to him as the work progressed by Inspector Braydon and Engineer Shriver that skeleton sheet piling or lagging was used in this trench, and it was left in the trench when it was filled; he was absent from the city from May 1st to May 21st, but was in Rutler alley May 22nd, when only the paving remained to be done, but saw no one working there.

*John Carey*, a builder, testified that he examined the plaintiff's house in 1907, and estimated what the necessary repairs would cost, and saw a man bailing water with a bucket out of this trench, which was filled with water.

*John Trainor*, who had an experience of thirty-odd years as a builder of sewers in Baltimore, and had made all sorts of excavations, said he had built sewers of various sizes from three or four feet in depth to twenty feet; that in this work he was accustomed to use lagging, and that he has seen rainstorms which flooded the trench and loosened the earth behind the lagging and the section would cave in, and that if water is allowed to get in a trench it will cut away the earth entirely. He testified that he examined the alley that morning; that the tops of the lagging ran along the curb, and in some places came up fair with the top of the pavement and a little higher; that the failure to cut off this lagging below the surface endangered the house; that he ran his whipstock down four and one-half feet below the curb next to the lagging, showing that the water strikes this lagging, runs down behind it and makes a cavity behind the lagging.

He also said he had large experience with bursted water pipes in sewer trenches and that they should always be supported when the trench is filled in. He said the trench ought not to have been opened its full length, nor to remain open exposed to the weather, and that it should have been put on the other side of the alley.

*Patrick Flannagan,* a sewer builder for twenty-five years, testified that he examined this alley just before the trial; that some of the lagging was still visible above the surface, and there was a recess behind the lagging into which he poured several buckets of water, which disappeared as fast as it was poured in. He said the custom was to cut off the lagging below the surface.

The above is a substantial statement of all the testimony adduced in the case. Due care is a question for the jury to be determined upon the facts in evidence, and experts cannot be allowed to usurp the province of the Court and jury by drawing those conclusions of law or fact upon which the decision of the case depends. *Stumore* v. *Shaw,* 68 Md. 19. In the 1st, 4th, 5th, 6th, 13th, 15th, 16th and 25th exceptions, the witnesses Walsh, McKnight, Knight, Trainor and Flanagan were each asked whether, under the circumstances stated in the respective questions, due care was exercised by the defendants, and there was consequently no error in refusing to allow these questions to be answered.

In the second exception the witness Walsh was asked if the repairs which he had stated were necessary would have restored the house to as good condition as before the building of the sewer. We can see no objection to the question as bearing upon the amount of damage sustained, but as this witness had already said these repairs would put the house "in as good condition as possible under the circumstances," there was no injury resulting from the refusal to allow it to be answered.

In the third exception this witness was asked what effect on the value of a house there would be from putting in iron anchors or braces which he had mentioned in the necessary repairs. There is no apparent objection to this question, and we think it should have been allowed.

The seventh and eighth exceptions were taken to the refusal to allow the plaintiff's counsel to read to the jury paragraphs *a, b, c, d, e,* and *f* of the contract between the Mayor and City Council and the contractors. The whole contract had been previously offered generally and admitted in evidence without restriction as to any part, and under these circumstances we are not aware of any principle upon which the plaintiff could be precluded from calling the attention of the jury to such provisions as it deemed material to her interest. If any question was presented of the construction of those passages, the jury could have been instructed by the Court upon request of the defendant.

The ninth and tenth exceptions were taken to the action of the Court in allowing the witness Knight on cross-examination to be asked whether the trench was allowed to stand open one or two weeks or longer. and why the sewer was built on the west side of the center of the alley instead of on the east side. We think he was qualified to answer the first question after referring to the records regularly delivered to him in the daily course of business, refreshing his recollection as he thereby did; and we can perceive no reason why he should not be allowed to give his reasons for locating the sewer on the west side of the alley, in reply to plaintiff's contention that it should have been located on the east side.

The eleventh exception was taken to the granting of a motion to strike out an answer of Mr. Knight to a question of plaintiff's counsel. The record is so confused at that point by a colloquy between the Court and counsel that it is impossible to determine to what question the motion was directed. Before we can reverse a ruling in such a situa-

tion we must be able to find some distinct and specific error, which we are unable to do in this instance.

In the twelfth exception the witness Trainor was asked, assuming the trench to be eight and one-half feet deep and four and one-half feet below the foundation of plaintiff's house on the west side of the alley, and that rain water was allowed to stand in the trench as testified to, what effect that would have had upon the lagging. The witness had qualified as an expert in digging sewer trenches and in the use of lagging in such work, and the question was a proper one for the information of the jury in reaching their conclusion as to the use of due care by the defendants.

For the same reason he should have been allowed to say whether in his judgment the sewer adjoining plaintiff's house should have been opened entire or built in sections. This bore not upon due care, but upon the approved method of building sewers, and there was evidence both that it was all open at once and that it was opened in sections. That conflict was for the jury, and it was for the jury to say under the circumtsances of the case that either method was or was not consistent with due care. There was error, we think, in this ruilng.

The seventeenth exception was taken to the refusal to allow the witness Trainor to answer what reason there was for not putting the sewer on the east side of the alley, and the eighteenth was to the question, "Ought not that sewer to have been built on the east side?" Both these questions asked for an opinion pure and simple, and the last emphasizes the vice by putting the question in a leading form. Whether there was negligence in the *location* of the sewer was as much a question for the jury to determine from such facts as to the location as were in evidence, as whether there was negligence in any detail of its construction, and neither was determinable by the mere opinion of a witness. There was no error in these rulings.

In the 19th exception the witness Trainor was asked in reference to the breaking of the water pipe, "Do you know what causes a breakage in a case of that sort?" the objection to which was sustained. This question was too broad and vague. He had heard Ward's testimony upon this subject, but he never saw the pipe and knew nothing of it. The twentieth exception is substantially the same question and is disposed of by what we have just said.

The twenty-first exception presents a very different question. That was, "Is there any usual and ordinary method commonly adopted to prevent this (breakage) which by Ward's testimony was shown not to have been done?" If the last clause of this question had been omitted it would have been material and proper, but the last clause assumed that Ward's testimony showed something had been left undone which should or might have been done, and there is no evidence to warrant this assumption. As framed there was no error in excluding this question.

The twenty-second exception is to a question asking Trainor if the usual precautions had been taken for protecting this pipe whether Ward would not have found some evidence of it. This was manifestly impossible for the witness to answer. In the twenty-third and twenty-fourth exceptions the witness Flanagan was asked what would be the effect of water standing in that trench of eight feet depth upon the lagging and also upon the foundations of the adjoining house. The answers to these questions coming from an expert would have stated facts directly aiding the jury in determining whether due care had been exercised by the defendants, and there was error in refusing to permit them to be answered. In 1 *Cyc.* 789, it is said the Court will take judicial notice of the probable consequences of an excavation, citing *Obert* v. *Denna*, 140 Mo. 476, where the earth fell in consequence of an excavation immediately adjoining and five feet below the foundation of a house. That of which the Court may take judicial notice may certainly be proved.

In the twenty-sixth exception there was the same vice as in the twenty-first, the question assuming without proof that something was omitted which should have been done, and there was no error in the twenty-seventh exception, in which Flanagan was asked to give his opinion from Ward's testimony as to what caused the pipe to break.

We now come to the prayers.

In *Baltimore* v. *Schnitker,* 84 Md. 43, the Court said: "The principles upon which municipal corporations are held liable for damages occasioned by defects in streets, sewers and other public works are well settled by numerous cases in this Court and elsewhere. The defendant does not insure its citizens againts damage from works of its construction, *and is only liable as other proprietors* for negligence or wilful misconduct."

In *Cahill* v. *Baltimore,* 93 Md. 288, JUDGE BOYD said: "Every owner of land within the bounds of a municipality may be required to suffer some injury in consequence of authorized improvements for the benefit of the public, for which he has no redress." But the learned Judge did not mean to include in those injuries such as are occasioned by the negligent commission or omission of municipal corporations in executing work they are authorized to perform, for in the same sentence he proceeds to say, "but to permit the same authorities to invade the property of such owner by making it the dumping ground for such articles as may be collected in the artificial drains constructed by them is as much an infringement on his rights as if they had taken possession of it for another purpose."

In *Baltimore and Pot. R. R.* v. *Reaney,* 42 Md. 130, JUDGE ALVEY said: "If a party acting under lawful authority inflict injury *in the manner of executing authority, as by unskillfulness or negligence,* he is liable for the consequences."

These cases will suffice to show that a municipal corporation has no greater immunity than a private corporation or person from the consequence of its own negligent or unskillful performance of lawful work.

Nor is there any difficulty in holding the City to be liable in this case for any negligence of the contractors in their performance of their contract, resulting in injury to the plaintiff; since the evidence is undisputed that the contractors were under the supervision of the City, and that the division sewer engineer was in control of the work. But even if Talbott & Co. were independent contractors the case would not be different. JUDGE SCHMUCKER, in *Bonaparte* v. *Wiseman,* 89 Md. 21, referring to *DeFord* v. *Keyser,* 30 Md. 179, declared "the distinction to be well established between the cases in which, when work is being done under a contract, an injury is caused by negligence in a matter collateral to the contract, and those in which the thing contracted to be done causes the mischief. In the former class of cases the employer is not liable for the injury, but in the latter he is."

We are not prepared to say there is any legally sufficient evidence in this case of negligence in the location of the sewer, but we are of opinion there was legally sufficient evidence tending to show negligence in the performance of the work resulting directly in injury to the plaintiff. There was evidence tending to show that the sewer was opened for its full length alongside of the plaintiff's house and was allowed to remain open during several severe rainstorms; that water was thus allowed to accumulate and stand in the trench for a considerable period in close proximity to plaintiff's wall; that the water pipe which burst in the trench after the trench was filled was unsupported in any manner, that being a matter within defendant's knowledge as to which it offered no evidence, and there being no evidence of any such support found in the trench when it was dug out to repair the pipe; also that the lagging used in the trench instead of being cut

off below the surface, as there was evidence to show was the custom, was left protruding so as to form a channel for the water flowing from the sidewalk, and cause it to sink down along the lagging in proximity to the wall; and that the injury to the house was the natural consequence of the above manner of performing the work. We may properly observe here that in a city, the subsurface of whose streets is filled with water pipes, gas pipes, telephone and telegraph conduits and other agencies, it is of the utmost importance that in all excavations made in the streets due care should be taken to protect and safeguard those agencies so as to be as secure after as before such excavation, and that the life and property of abutting residents should be protected from injury that might result from such negligence.

In *Stearns* v. *Richmond,* 88 Va. 929 (29 Amer. St. Rep. 758), it was held that the right of an adjoining private owner to lateral support may be asserted as against a municipality making excavations in a street as well as against a private individual. The Court said: "A city having authority to grade its streets cannot, under the specious plea of public convenience, be permitted to exercise that dominion to the injury of another's property, in a mode that would render a private individual responsible in damages, without being responsible itself." It was argued in behalf of the City here upon the authority of *Shafer* v. *Wilson,* 44 Md. 281, that it was the duty of Mrs. Hanrahan to shore or prop her house so as to render it secure in the meantime. But we think it is obvious that this is required not to guard against negligence of the other party in making the excavation, but to protect himself against an inevitable injury which might otherwise result from the most careful performance of the work. This is apparent from the following passage from *Shafer* v. *Wilson:* "The authorities are somewhat conflicting as to the extent of the right of the owner of any adjacent land built upon to improve his own property where he is under no dis-

ability (from grant of easement, prescriptive right or necessity) to restrict him, although it may operate to injure his neighbor's property. But it is agreed on all sides that his *right*, whatever that may be, *must* be exercised with due care and skill and, at his peril, to prevent injury to the adjacent owner."

And in *Serio* v. *Murphy*, 99 Md. 545, JUDGE FOWLER said: "If the owner of the building endangered by the proposed excavation has received proper notice, the party making the excavation is responsible only for actual or positive negligence in the manner of doing the work." So that whether the owner does or does not shore up his property, in either event if he is injured by the negligence of the other party he is not debarred from recovery.

It is true that the right of lateral support only extends to the soil in its natural condition, and does not protect buildings adding weight to the land, but the erection of buildings does not destroy the pre-existing right of support to the soil itself. In such cases there is no right of action for unavoidable injury not caused by negligence or unskillfulness, and which would not have occurred if there were no building on the land. But negligence resulting in injury gives a cause of action whether the land is built on or not.

We are not left to conjecture in this case the view held by the Court of the evidence of negligence to which we have referred, since in ruling upon the prayers the learned Judge delivered an oral opinion of some length incorporated in the record, in the course of which he said: " * * * There is no such exactness about the testimony in this case which, if the jury believed all the evidence that has been offered here on the part of the plaintiff, would point unavoidably and unerringly to a condition of affairs caused by the negligence of the construction of the sewer, and it is upon that ground, and upon that alone, that I will grant the defendant's pray-

ers that there is no legally sufficient evidence in the case to entitle the plaintiff to recover."

We do not understand this to be the test of the legal sufficiency of evidence. In *Mallette* v. *British Assurance Co.,* 91 Md. 481, it was said, repeating the early rule: "The Court must assume the truth of all the evidence tending to sustain the claim, and all inferences of fact deducible from it."

In *Wetherall* v. *Clagett,* 28 Md. 465, the Court said: "Though the testimony be weak and inconclusive, yet if derived from a legal source and pertinent to the issue, the jury was the proper tribunal to pass on it." And in *McElderry* v. *Flanagan,* 1 H. & G. 308, the Court said: "If there be evidence from which a rational mind could infer a fact in issue, the County Court have invaded the province of the jury and their judgment must be reversed."

The view expressed by the learned Judge of the Baltimore City Court cannot be reconciled with those to which we have referred, and we are of opinion that it was error to withdraw the case from the jury.

We cannot regard this case as falling, as was argued, within *Harford County* v. *Wise,* 75 Md. 38, in which the affirmative evidence was equally balanced as to which of two causes produced the injury, for one of which the Court held the defendant was and for the other he was not responsible, and where it was held that neither cause could be said to be established by legitimate proof, the evidence in respect thereto being in a state of equipoise as to which caused the injury. This Court said the lower Court should have held there was in that condition of the proof no legally sufficient evidence of the cause for which defendant would have been liable if there had been such evidence. For the reasons stated the judgment must be reversed.

> *Judgment reversed, with costs to the appellant above and below, and new trial awarded.*